United States Court of Appeals United States Court of Appeals
For the First Circuit For the First Circuit



Nos. 96-1446, 97-1552

RAN CHOEUM,

Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE,

Respondent.



ON PETITION FOR REVIEW OF FINAL ORDERS OF THE
BOARD OF IMMIGRATION APPEALS



Before

Torruella, Chief Judge, 
Bownes, Senior Circuit Judge, 
and Lynch, Circuit Judge. 



Richelle S. Kennedy, with whom Steven W. Hansen and Bingham, Dana 
& Gould LLP were on brief, for petitioner. 
David V. Bernal, Senior Litigation Counsel, Office of Immigration 
Litigation, Civil Division, Department of Justice, with whom Philemina 
McNeill Jones, Assistant Director, and Frank Hunger, Assistant 
Attorney General, Civil Division, Department of Justice, were on
brief, for respondent.


November 5, 1997


LYNCH, Circuit Judge. The difficulty of wending LYNCH, Circuit Judge. 

through this country's immigration laws -- for the immigrants

involved, for the courts, and even for the federal agencies

charged with enforcing the laws -- is illustrated by this

case. For the courts, what is involved is properly

ascertaining congressional intent in light of constitutional

guarantees in decision of cases. For this Cambodian

immigrant, Ran Choeum, what is involved is whether she will

be deported, possibly back to that war-torn land she left

when she was a child. She petitions for review of two

decisions of the Board of Immigration Appeals ("BIA"), one

dated February 9, 1996, denying her applications for asylum

and withholding and for discretionary waiver, and one dated

April 22, 1997, denying her motions to reopen.

In the interim, the complexity of the immigration

laws was enhanced by two new statutes. On April 24, 1996,

the Antiterrorism and Effective Death Penalty Act, Pub. L.

104-132, 110 Stat. 1214 (1996) ("AEDPA"), was signed into

law. On September 30, 1996, (the same day Choeum moved to

reopen before the BIA) the Illegal Immigration Reform and

Immigrant Responsibility Act, Pub. L. 104-208, 110 Stat. 3009

(1996) ("IIRIRA"), was signed into law. Both statutes

contain jurisdiction-stripping provisions removing from the

federal circuit courts of appeals their previous jurisdiction

over certain categories of final orders of deportation.

-2- 2

This case was originally argued on May 9, 1997. In

a decision dated July 2, 1997, we upheld the decisions of the

BIA on reasoning which rejected particular arguments by both

sides. Each party filed petitions for rehearing. The

Immigration and Naturalization Service (INS), in its

rehearing petition, for the first time raised a new argument

that this court lacked jurisdiction to review both of the BIA

orders because AEDPA 440(a) precludes jurisdiction over

deportations for "aggravated felonies" under IIRIRA 321. 

It would have been vastly preferable, of course,

for the INS to have asserted this jurisdictional argument

initially, and we have some concern about the government's

burdening of immigrants with the obligation to respond to

new-found statutory interpretations by the INS after a case

has been heard and decided.1 Nonetheless, because rehearing

was timely sought and parties may not waive issues of subject

matter jurisdiction,2 we granted rehearing on particular

issues. We withdraw our earlier opinion and restate in this

opinion those of our earlier conclusions which remain

 

1. In another sense, however, Choeum is the beneficiary of
the government's shifting position. Because mandate has
never issued, and because Choeum has not been deported during
the pendency of this appeal, the effect of the government's
delay in making its new jurisdictional argument has been to
delay Choeum's deportation.

2. See United States v. Baucum, 80 F.3d 539, 541 (D.C. Cir. 
1996); Michigan Employment Security Comm'n v. Wolverine Radio 
Co., Inc., 930 F.2d 1132, 1137-38 (6th Cir. 1991); Escobar 
Ruiz v. INS, 813 F.2d 283, 286 n.3 (9th Cir. 1987). 

-3- 3

pertinent. We conclude that we have jurisdiction to review

the first decision of the BIA, which requires deportation,

and sustain that decision on its merits. We conclude that we

lack jurisdiction over the second BIA decision, denying

Choeum's petition to reopen.

I.

Ran Choeum, an immigrant from Cambodia, pleaded

guilty in New York state court to charges of burglary and

kidnapping. The charges stemmed from a crime in which

Choeum's boyfriend, seeking to settle a family grievance,

murdered two elderly relatives of his sister's fianc .

Choeum, who left the scene before the murders took place,

pleaded guilty to burglary and kidnapping in order to avoid a

possible murder conviction under the felony murder rule.

While Choeum was in prison, deportation proceedings against

her commenced. 

Choeum seeks review of the BIA order of deportation

of April 24, 1996. She argues that AEDPA changes the

standard for determining whether an alien is eligible for

withholding of deportation. She also argues that the

Attorney General's regulation under which her application for

asylum was denied exceeds the authority delegated to the

Attorney General by Congress. Finally, she contends that the

BIA abused its discretion in failing to grant her

discretionary relief from deportation. She also petitions

-4- 4

for review of the BIA's decision of April 22, 1997, denying

her motion to reopen.

The INS, for its part, argues that, under AEDPA,

this court lacks jurisdiction to review Choeum's petitions.

The jurisdictional argument comes in two parts. First, the

INS argues that this court has no jurisdiction over either

petition for review because AEDPA 440(a), 8 U.S.C. 

1105a(a)(10), removes jurisdiction over deportations for

"aggravated felonies" as that term is more broadly defined in

IIRIRA 321(a), 8 U.S.C. 1101(a)(43). In light of the

effective date provided in IIRIRA 321(c), we agree that

there is no jurisdiction over the second petition on this

ground, but the first petition survives this attack. Second,

the INS argues there is still no jurisdiction over the first

petition for review because she is an alien who has committed

a firearms offense under 8 U.S.C. 1251(a)(2)(C), in this

case, burglary, and AEDPA 440(a) does not permit review of

deportations based on such grounds. We hold that judicial

review remains available because in the agency deportation

proceedings, Choeum was charged with deportability based only

on her kidnapping offense, which is a crime of moral

turpitude under 8 U.S.C. 1251(a)(2)(A)(i), and not with a

firearms offense. 

We further hold that the INS may not substitute

alternative grounds for deportation at this stage in the

-5- 5

proceedings, and that its argument fails both as a matter of

statutory construction and because it raises due process

concerns under the Constitution. Therefore, AEDPA does not

deprive this court of jurisdiction to hear Choeum's first

petition. Choeum's legal arguments, however, while ably

made, do not convince us that the BIA erred in denying Choeum

the various forms of relief sought. Accordingly, the BIA's

decision is affirmed.

II.

Ran Choeum was born in a small Cambodian village in

1969. She was one of twelve children; her father was a

soldier and her mother supported the family by rice farming.

In 1973, her father was killed. The Khmer Rouge came to

power in the area in 1975, and Choeum's mother, fearing

retaliation for her husband's military activities, fled with

her children to another village. Choeum's mother died in

1978 of starvation and illness. In 1979, Choeum's oldest

sister brought Choeum and two other sisters, the only

surviving members of the family, to a refugee camp in

Thailand; they lived in various camps for the next five

years.

On March 27, 1985, Choeum and her sisters were

admitted to the United States as refugees; Choeum was later

granted permanent resident status, retroactive to that date.

The Choeums' sponsors helped them to obtain welfare and

-6- 6

housing. Choeum, who was fifteen at the time, had never been

to school in Cambodia and spoke no English. Choeum briefly

attended high school in Brooklyn, but dropped out when she

became pregnant by her boyfriend, a Cambodian immigrant named

Lak Ling. Choeum's son Wicky was born on January 2, 1987.

At Lak Ling's request, Choeum and her son moved to

Philadelphia to live with his relatives.

In June 1988, Lak Ling, Choeum and the baby

travelled to New York for Ling's sister's engagement party.

When they arrived at Ling's parents' house, they learned that

the sister, who was only fourteen, and her fianc , a twenty-

eight year old Cambodian man, had disappeared and that the

fianc 's family had not paid the $2,000 dowry owed Ling's

family. 

The next night, June 5, Choeum went outside to buy

ice cream for her son. She saw Ling in a car with three

Chinese men she did not know. Ling told her to get in the

car, and told her that they were going to get his sister.

When they arrived at a large apartment house on Ocean Avenue,

Brooklyn, they all went upstairs and Ling told Choeum to

knock on the door of the apartment where Ling's sister's

fianc 's parents lived. No one answered. After driving

around, they returned to the house and the Chinese men

knocked on the door. One of the men was carrying a paper

bag.

-7- 7

This time, the door was opened. The men went in,

and Choeum followed. The Chinese men began searching the

apartment, while Ling talked to his sister's fianc 's

parents. The Chinese men began piling up money and jewelry on

the floor in front of the parents. One of the Chinese men

brought two young children into the room. Ling instructed

them to tie the children up. Ling assured Choeum that he was

just trying to scare the parents into revealing where his

sister was. The men brought the children into another room,

took out a knife, cut the telephone cord, and bound the

children with it. One of the children says that Choeum

helped tie up the children and put tape on their mouths.

According to Choeum, she merely watched, and then she noticed

that her boyfriend was holding a gun. Choeum asserts that

she became scared, went back into the other room, and untied

the children; the Immigration Judge, however, did not credit

this testimony. One of the men yelled at her to get out when

he saw her near the children. All four men then screamed at

Choeum to leave and wait in the car. She went outside and

waited. When the men returned to the car fifteen minutes

later, she asked if anything had happened; Ling assured her

that everything was fine. Choeum returned to Ling's parents'

house.

The next morning, Choeum was arrested. It was then

that she learned that the two adults at the Ocean Avenue

-8- 8

apartment had been murdered. She was charged with a variety

of crimes, but agreed to cooperate with the police and to

help them find Ling. Facing a possible murder conviction,

Choeum pleaded guilty to kidnapping in the third degree and

burglary in the first degree, with a three to nine year

sentence.

While in prison, Choeum received favorable

performance assessments, particularly from her teachers. She

made rapid progress in English, and came close to achieving a

GED despite her complete lack of formal education. Choeum

was released in September 1991. She moved to Lowell,

Massachusetts to live with her sisters and their children.

She enrolled in job training programs, eventually finding a

manufacturing job. The social services professionals who

worked with her were impressed by her eagerness to work and

to improve herself.

In 1993, Choeum gave birth to a second son, David.

David's father left her after she became pregnant and has no

contact with his son. Choeum quit her job when she became

pregnant with David, and receives welfare and food stamps.

Choeum still resides near her sisters in Lowell, and helps

them, as none of the others are proficient in English.

Choeum's older son, Wicky, lives in Philadelphia with Lak

Ling's parents, who gained custody of him during Choeum's

imprisonment. Choeum does not see Wicky often, but speaks to

-9- 9

him monthly on the phone. Choeum asserts in her most recent

affidavit that she is pregnant with a third child. She also

asserts that, because she fears for their safety, she would

leave Wicky and David in this country were she to be deported

to Cambodia.

III.

Deportation proceedings were initiated against

Choeum with the issuance of an Order to Show Cause ("OSC") on

September 18, 1990. The OSC charged Choeum with

deportability pursuant to the then-current version of Section

241(a)(4)3 of the Immigration and Nationality Act ("INA"), in

that she had been convicted of a crime of moral turpitude

committed within five years after entry and sentenced to

imprisonment for a year or more. The OSC stated that the

crime of moral turpitude was kidnapping. The OSC did not

refer to Choeum's burglary conviction either in the factual

allegations or in the grounds for deportability.

In her responsive pleadings, filed March 31, 1992,

Choeum admitted the factual allegations in the OSC and

conceded deportability as charged. She also sought the

opportunity to apply for asylum, withholding of deportation,

and waiver of deportability pursuant to INA 212(c), 8

U.S.C. 1182(c).

 

3. The section has been amended several times since then;
the current version of the provision is Section
241(a)(2)(A)(i), 8 U.S.C. 1251(a)(2)(A)(i).

-10- 10

A hearing was held before an Immigration Judge on

August 7, 1992. The facts and circumstances of Choeum's

crime were fully explored, including through testimony by

Choeum's defense attorney. The Immigration Judge denied her

applications for asylum under INA 208(a), 8 U.S.C. 

1158(a), and for withholding of deportation under INA

243(h), 8 U.S.C. 1253(h), on the grounds that such

applications must be denied if the alien, having been

convicted of a particularly serious crime in the United

States, constitutes a danger to the community. The

Immigration Judge found that, based on all the evidence

concerning Choeum's burglary and kidnapping convictions, she

had "in fact been convicted of a particularly serious crime."

He noted that the BIA has interpreted the statutory language

to mean that an alien convicted of a particularly serious

crime necessarily constitutes a danger to the community.

Therefore, he ruled, Choeum was not eligible for asylum or

withholding of deportation.

Regarding Choeum's application for a discretionary

waiver under INA 212(c), the Immigration Judge engaged in a

careful balancing of the equities. Going through factors

identified as significant by the BIA, the Immigration Judge

found that Choeum's separation from Wicky and her sisters and

the conditions in Cambodia were significant factors, but

those facts did not overcome the egregious and horrible

-11- 11

nature of her crime. On this ground, the Judge denied

Choeum's application for discretionary waiver as well. 

Choeum appealed the decision to the BIA, arguing

that the equities, including the birth of her second child

after the hearing, warranted an exercise of favorable

discretion under INA 212(c), and that the Immigration Judge

should have made a separate determination that Choeum posed a

danger to the community before denying her applications for

asylum and withholding of deportation. In a decision dated

February 9, 1996, the BIA dismissed Choeum's appeal,

reaffirming its view that an alien who has been convicted of

a particularly serious crime necessarily constitutes a danger

to the community and is ineligible for withholding of

deportation and asylum. The BIA further found that the

Immigration Judge gave proper consideration to the

discretionary factors in denying Choeum's request for Section

212(c) relief.

AEDPA was signed into law on April 24, 1996.

Choeum's petition for review was filed with this court on May

9, 1996. On September 30, 1996, Choeum filed a motion to

reopen with the BIA, based on new evidence, particularly the

birth of David and the expectation of a third child, and on

the argument that AEDPA 413(f), 8 U.S.C. 1253(h), removed

the bar to withholding of deportation for aliens convicted of

particularly serious crimes. The BIA denied Choeum's motion

-12- 12

to reopen on April 22, 1997, finding that under AEDPA

440(d), Choeum was now statutorily ineligible for INA

212(c) relief, and rejecting her interpretation of AEDPA

413(f). Choeum has asked this court to review this

decision as well.

IV.

A. Jurisdiction: The Effective Date of IIRIRA 321(c) 

Correctly pointing out that Congress in the IIRIRA

expanded the definition of "aggravated felonies" and

precluded judicial review over deportations for aggravated

felonies, the INS argues this court lacks jurisdiction over

both petitions. Because we agree that kidnapping, the basis

for the order deporting Choeum is an "aggravated felony,"4

the decisive question has to do with when this new definition

became effective and the application of that effective date

to the facts of this case.

IIRIRA 321(c) establishes the "effective date"

after which these definitions of "aggravated felony" are

binding:

 

4. Under IIRIRA 321(a), an "aggravated felony" is "a crime
of violence (as defined in section 16 of Title 18, but not
including a purely political offense) for which the term of
imprisonment at least one year." 8 U.S.C. 1101(a)(43)(F). A
"crime of violence" is defined as "an offense that has as an
element the use, attempted use, or threatened use of physical
force against the person or property of another." 18 U.S.C.
16(a). Because kidnapping satisfies the terms of 8 U.S.C.
16(a) and Choeum's term of imprisonment exceeded one year,
Choeum committed an aggravated felony under IIRIRA 321(a). 

-13- 13

The amendments made by this section shall
apply to actions taken on or after the 
date of the enactment of this Act,
regardless of when the conviction
occurred . . . .

IIRIRA 321(c) (emphasis added). The IIRIRA was enacted on

September 30, 1996, so federal courts may not hear appeals

from "actions taken" regarding final orders for deportation

occurring after September 30, 1996 where the basis for

deportation is commission (at any time) of an "aggravated

felony."

IIRIRA 321(c) does not itself define "actions

taken." Neither of the interpretations offered by the

parties appear appropriate. Choeum argues that the most

sensible interpretation of "actions taken" is that it refers

to immigration proceedings brought against the immigrant.

Choeum thus characterizes "actions" in the immigration

context as analogous to a civil action. Choeum cites Black's 

Law Dictionary in support of this proposition, that "action"

should be defined in its "usual sense" as a "lawsuit brought

in court" -- i.e., the filing of the complaint. Under this 

definition, "actions taken" would refer only to removal

proceedings begun after September 30, 1996, with no 

retroactive application to pending proceedings. The INS

began removal proceedings against Choeum in 1990.

The INS argues that "actions taken" means any 

action taken regarding the case constitutes an "action

-14- 14

taken." The INS argues that judicial review is such an

action. Thus, this court's exercising of jurisdiction over

the matter (by hearing the case in May, 1997), the INS

argues, causes the court to be divested of jurisdiction. The

INS relies for support on a two page, per curiam opinion in

Mendez-Morales v. INS, 119 F.3d 738 (8th Cir. 1997), which 

decides that "[b]ecause judicial review by this court would

be an 'action taken' for purposes of IIRIRA 321(c), we have

no jurisdiction to hear [petitioner's] appeal." Id. at 739. 

That court did not explain this statement nor cite to

authority. As to the second petition, the INS says that this

court has no jurisdiction because, in any event, the BIA's

denial of Choeum's motion to reopen her case constitutes an

"action taken" after the September 30, 1996 date. We agree

only with the latter argument.

Both sides present untenable definitions in their

arguments. It is not obvious that "action" in the

immigration context does or should have the same meaning as

an "action" in the civil context. The court of appeals

review actions by the administrative agency in deportation

cases and Choeum attacks four different actions on review.

Choeum's position assumes there can be only one action, and

that is the initial filing in a matter. The INS's position

is also flawed: it is unlikely Congress intended the very

act of exercising jurisdiction to trigger the destruction of

-15- 15

that jurisdiction. If Congress had intended to affect every

petition pending in a court, there was much clearer language

available to express such an intent. Neither does it make

sense that federal jurisdiction should be dependent on when a

court schedules a hearing on a particular petition. For

example, it seems irrational that a federal court would have

jurisdiction over a matter if it heard argument on September

29, 1996, but would not have jurisdiction if it postponed the 

argument until October 1, 1996.

Valderrama-Fonseca v. INS, 116 F.3d 853 (9th Cir. 

1997) is the only other opinion we have found that considers

the definition of "actions taken" under IIRIRA 321(c). The

facts are similar to this case. The INS sought to deport an

alien because he had committed burglary, a crime of "moral

turpitude;" the INS then argued that AEDPA 440(a) precluded

judicial review of the final order of deportation because the

crime was also an "aggravated felony" under 8 U.S.C.

1101(a)(43). There was no question that the alien's

offense would constitute an "aggravated felony" if the

revised definition were applicable under IIRIRA 321(c);

hence the precise issue upon which jurisdiction depended was

whether an "action" had been "taken" after September 30,

1996.

The court offered three potential definitions of

"actions taken." "Actions taken" could refer to: (l) orders

-16- 16

and decisions issued against an alien by the Attorney General

acting through the BIA or Immigration Judge, (2) steps taken

by the alien, such as applying for discretionary relief, (3)

to any action by anyone, including a circuit court. Id. at 

856. The court did not consider Choeum's proposed

definition: that "actions taken" refers exclusively to the

commencement of deportation proceedings against the alien.

We largely agree with the holding of Valderrama- 

Fonseca. The third reading is improbable: it makes no sense 

that federal jurisdiction should be based on the oral

argument calendar. The second definition is plausible, as

IIRIRA 309(c)(4)(A) refers to an "action for judicial

review," which would be initiated by the client herself. But

we need not decide the issue on the facts of this case.

Choeum filed her first petition for review on May 9, 1996

well before the effective date. The first definition is the

strongest and most sensible: that "actions taken" refers to

actions and decisions of the Attorney General. "This makes

logical and practical sense, as 'actions taken' is easily

understood to encompass things done by an agency to an

alien." Id. This interpretation is also consistent with how 

the word "actions" is used in another section of the INA

limiting federal court jurisdictional section of the INA, 8

U.S.C. 1252(g):

Except as provided in this section and
notwithstanding any other provision of

-17- 17

law, no court shall have jurisdiction to
hear any cause or claim by or on behalf
of any alien arising from the decision or
action by the Attorney General to
commence proceedings, adjudicate cases,
or execute removal orders against any
alien under this chapter.

We conclude that jurisdiction over Choeum's first

petition is not removed by virtue of AEDPA 440(a). The

decision of the immigration judge and the BIA's affirmance

all occurred prior to October 1, 1996, so the revised

"aggravated felony" rules in IIRIRA 321(a) do not apply.

By the same reasoning, this court does not have jurisdiction 

over Choeum's second petition, because the BIA's denial of

Choeum's motion to reopen occurred on April 22, 1997, which

is after the October 1, 1996 triggering date for 

applicability of the "aggravated felony" rules. We dismiss

the second petition.

B. Jurisdiction: AEDPAand Basis for BIA's Deportation Order 

The INS also filed a motion to dismiss with this

court, arguing that Section 440(a) of AEDPA, apart from

IIRIRA, deprives this court of jurisdiction to hear this

case. That section ousts the jurisdiction of the federal

courts to review the deportation petitions of, among other

classes of aliens, aliens deportable by reason of firearms

offenses under 8 U.S.C. 1251(a)(2)(C). The INS contends

that Choeum's burglary conviction was such an offense.

However, at the deportation proceedings, the INS did not

-18- 18

assert the burglary offense as a basis for deportation.

Instead, the INS rested on the kidnapping offense, although

the INS did not argue that the kidnapping was also a firearms

offense. The INS's argument seems to be that because it

might have sought to deport Choeum based on her burglary- 

firearms conviction, even though it chose not to do so, this 

court lacks jurisdiction to review Choeum's deportation based

upon her kidnapping non-firearms offense because this court

lacks jurisdiction over a burglary-firearms based

deportation, even though this was not the basis for

deportation.

Section 440(a) of AEDPA amended Section 106(a)(10)

of the INA, 8 U.S.C. 1105a(a)(10),5 to provide that final

orders of deportation against aliens who are "deportable by

reason of having committed" certain types of criminal

offenses, including firearms offenses, "shall not be subject

to review by any court." AEDPA 440(a), 110 Stat. at 1276-

77. This provision of AEDPA applies to pending cases.

 

5. Section 106 of the INA, 8 U.S.C. 1105a was repealed by
306(b) of the Illegal Immigration Reform and Immigrant
Responsibility Act of 1996, Pub. L. 104-208, 110 Stat. 3009-
546 ("IIRIRA"); IIRIRA substitutes new judicial review
provisions. See IIRIRA 306(a), 8 U.S.C. 1252. However, 
this repeal applies only to final orders of deportation and
motions to reopen filed on or after April 1, 1997. See 
IIRIRA 306(c), 309, 110 Stat. at 3009-612, 625, as amended 
by Pub. L. 104-302, 110 Stat. 3656 (Oct. 11, 1996)(technical 
amendment clarifying that judicial review provisions of
IIRIRA are not effective upon enactment). IIRIRA also
provides transitional rules for certain classes of cases, see 
infra. 

-19- 19

Kolster v. INS, 101 F.3d 785, 790 (1st Cir. 1996). Under 

AEDPA, judicial review remains available to aliens who have

committed other types of offenses, including aliens who have

been convicted of only one crime of moral turpitude. See 

AEDPA 440(a); 8 U.S.C. 1251(a)(2)(A). The INS contends

that the first degree burglary charge to which Choeum pleaded

guilty was a firearms offense as defined by Section

241(a)(2)(C) of the INA, which renders deportable any alien

who "is convicted under any law of . . . using . . . any

weapon . . . which is a firearm . . . in violation of any

law." 8 U.S.C. 1251(a)(2)(C). Therefore, the INS

contends, Choeum is "deportable by reason of having

committed" a firearms offense and Section 440(a) of AEDPA

deprives this court of jurisdiction to hear her petition.

Choeum makes two responses to the INS's argument.

First, Choeum argues that she was not, in fact, convicted of

a firearms offense, as her plea colloquy reveals that she

herself did not "use" a handgun.6 Second, Choeum points out,

 

6. Under New York law, a person is guilty of burglary in the
first degree "when he knowingly enters or remains unlawfully
in a dwelling with intent to commit a crime therein, and when
in effecting entry or while in the dwelling or in immediate
flight therefrom, he or another participant in the crime: 
1. Is armed with explosives or a deadly weapon; or
2. Causes physical injury to any person who is not a
participant in the crime; or 
3. Uses or threatens the immediate use of a dangerous
instrument; or 
4. Display what appears to be a pistol, revolver, rifle,
shotgun, machine gun, or other firearm . . . ."
N.Y. Penal Law 140.30 (emphasis added).

-20- 20

correctly, that the OSC only referenced the kidnapping

conviction. 

It is undisputed that the burglary conviction was

not charged as a basis for deportation in the OSC, and that

Choeum's concession of deportability only encompassed the

grounds charged in the OSC, i.e. that she was in fact 

deportable because the kidnapping conviction was a crime of

moral turpitude. The Immigration Judge did, as the INS

points out, hear extensive testimony on the nature of

Choeum's crime. Notably, however, he did not attempt to

determine whether Choeum had used a firearm, because that was

not an issue in the proceedings before him. 

The INS's argument is essentially a linguistic one.

According to the INS, for purposes of jurisdiction, aliens

"deportable by reason of" having committed firearms offenses 

are not only those aliens who have been ordered deported for 

firearms offenses, but also those aliens who could be 

deported for that reason. As a matter of statutory

construction, that argument is somewhat illogical: The

contested phrase comes from Section 440(a) of AEDPA, a

statutory section solely concerned with final orders of

deportation. The section therefore applies, by its very

terms, only to aliens who have actually been adjudged

 

Thus, under New York law, Choeum could be convicted of
burglary in the first degree simply by virtue of Ling's use
of the gun.

-21- 21

deportable. It is therefore highly doubtful that, in that

context, Congress meant "deportable by reason of" to mean, as

the INS would have it, "potentially susceptible to being

deported by reason of . . ." 

The reading of the statute that the INS proposes

also raises due process concerns. "It is well established

that the Fifth Amendment entitles aliens to due process of

law in deportation proceedings." Reno v. Flores, 507 U.S. 

292, 306 (1993). At the core of these due process rights is

the right to notice of the nature of the charges and a

meaningful opportunity to be heard. See, e.g., Kwong Hai 

Chew v. Colding, 344 U.S. 590, 596-98 (1953); Kaczmarczyk v. 

INS, 933 F.2d 588, 596 (7th Cir. 1991)(citing cases).  

We do not need to determine what form of notice

would be constitutionally required, because the statutory and

regulatory scheme under which deportation proceedings are

conducted mandate specific procedures. The INA itself

provides that, in deportation proceedings, written notice --

referred to as an order to show cause -- shall be given to

the alien specifying, among other things, "[t]he charges

against the alien and the statutory provisions alleged to be

have been violated." 8 U.S.C. 1252b(a)(1)(D). INS

regulations permit the INS to lodge additional charges of

deportability "at any time during a hearing" before an

Immigration Judge, but specifically state that these charges

-22- 22

must be submitted in writing for service on the alien and for

entry into the record, that the Immigration Judge shall read

the additional charges to the alien and explain them to her,

and that the alien may have a reasonable time, including

requesting a continuance, to respond to additional charges.

8 C.F.R. 242.16(d). It is undisputed that the INS did not,

at any time, reopen deportation proceedings to comply with

these statutory and regulatory formalities.

In United States v. Hirsch, 308 F.2d 562 (9th Cir. 

1962), the BIA had ordered petitioner deported on the basis

of crimes which were admitted into evidence at his

deportation hearing, but which were never added to the INS's

charge against him. The court found that this procedure not

only violated INS regulations similar to the ones discussed

above, but also contravened basic notions of procedural due

process:

[A]t all pertinent times, petitioner was
entitled to a statement of the charges
against him, to a hearing of those
charges, and to answer them. 
Procedural due process requires no
less, and such due process is required in
such a hearing. We have frequently
commented upon the severity of the remedy
of deportation, with the consequent
requirement that prescribed procedures
must be followed for the protection of
the alien. Surely being advised of the
charges upon which the proceeding is
based is fundamental to due process.

Id. at 566-67 (internal citations omitted). 

-23- 23

Here the INS is not actually attempting to deport

the petitioner on uncharged grounds, but rather using

uncharged grounds to cut off judicial review. However, this

court has found that even arguably lesser deprivations of

notice and the opportunity to be heard "ran afoul of

petitioner's procedural rights." Gebremicheal v. INS, 10 

F.3d 28, 39 (1st Cir. 1993) (holding that BIA could not rely

on extra-record facts concerning human rights in Ethiopia

without affording petitioner an opportunity to respond). In

these circumstances, where the word "deportable" has a

meaning that the context makes plain, and the INS asks us to

choose a different interpretation, we are influenced by the

maxim of statutory construction that tells us to interpret

statutes so as to avoid constitutional concerns. See, e.g., 

Frisby v. Schultz, 487 U.S. 474, 483 (1988); United States v. 

Three Juveniles, 61 F.3d 86, 90 (1st Cir. 1995). We 

therefore reject the INS's suggested interpretation of

Section 440(a)'s use of "deportable by reason of." 

The INS suggests that this court can make the

necessary determination that Choeum's offense was a firearms

offense, implying that briefing and argument before this

court provide sufficient notice. The INS points out that in

Kolster, we termed deportability "a largely mechanical 

determination based on facts that can often be objectively

ascertained." 101 F.3d at 789. That description, of course,

-24- 24

assumes that the necessary facts will be before the decision

maker. Use of a firearm not being an issue in the

proceedings below, the record before this court cannot be

considered complete and the INS argument fails on pragmatic

grounds.7 More importantly, it is not the institutional role

of this court to serve as a factfinding body on issues of

first impression. 

We hold that the INS cannot, consistent with due

process and the statutory and regulatory requirements

governing its own proceedings, substitute new grounds for

deportation at this stage in the proceedings, solely for the

purposes of depriving the federal courts of jurisdiction.8

 

7. The INS draws our attention to Yang v. INS, 109 F.3d 1185 
(7th Cir. 1997). In that case, petitioner contested the
administrative finding that he was deportable by reason of
having committed certain crimes, crimes which would render
him ineligible, under AEDPA, for judicial review of his
deportation order. The Seventh Circuit asserted that "a
court has jurisdiction to determine whether it has
jurisdiction" and reviewed the record to see if the law had
been properly applied to petitioner's case. Id. at 1192. 
That situation, where the court reviews the administrative
record to determine if the law has been correctly applied to
petitioner's case, is not analogous to the situation here,
where the question to be answered was not addressed in the
proceedings below.

8. To the extent that Abdel-Razek v. INS, 114 F.3d 831 (9th 
Cir. 1997), takes a different position on this issue, we find
it unpersuasive. But we do not believe that Abdel-Razek 
really conflicts with our conclusion. Abdel-Razek, and 
Mendez-Morales v. INS, 119 F.3d 738 (9th Cir. 1997), which 
the INS also cites, both involve aliens who had committed a
single crime which was the sole basis for their respective
deportations, and the issue was whether the INS could
substitute one ground for deportation, i.e., commission of a 
crime of moral turpitude, for another, i.e., an aggravated 

-25- 25

We therefore need not determine whether or not Choeum's

conviction for burglary in the first degree constitutes a

firearms offense. We turn to Choeum's claims of legal error,

based on the grounds on which the INS actually proceeded. 

V.

Choeum appeals the February 9, 1996 denial of her

applications for three separate types of relief from

deportation: (1) withholding of deportation under Section

243(h) of the INA, 8 U.S.C. 1253(h); (2) asylum under 8

U.S.C. 1158;9 and (3) discretionary waiver of deportability

under Section 212(c) of the INA, 8 U.S.C. 1182(c).10 We

address each of these claims in turn.

 

felony. This a different situation than we have in the
present case, where Choeum had committed two different
crimes, and the INS wishes to use one crime as the basis for
deportation but then the other crime as the basis for denying 
this court jurisdiction. By citing Abdel-Razek as authority 
that opposes this conclusion, the INS confuses the legal
grounds for deportation with its underlying factual basis.

9. Withholding of deportation and asylum are similar in that
both offer relief from deportation based on the likelihood of
persecution in the alien's home country. Asylum requires a
greater showing than withholding, and carries with it the
entitlement to become a lawful permanent resident, and
eventually a citizen. Withholding, on the other hand, does
not give the alien the automatic right to remain in the
United States; the alien may still be deported to a third
country in which she would not face persecution. See INS v. 
Cardoza-Fonseca, 480 U.S. 421, 428 n.6 (1987). 

10. Section 212(c), by its express terms, permits the
Attorney General to waive the exclusion of otherwise
excludable aliens; a longstanding interpretation extends this
discretionary authority to the waiver of deportation.
Kolster, 101 F.3d at 787. 

-26- 26

A. Withholding of Deportation 

Choeum's argument with regard to withholding of

deportation again requires us to consider the effect of

AEDPA's amendments to the immigration laws. Section

243(h)(1) of the INA, 8 U.S.C. 1253(h)(1), provides that:

The Attorney General shall not deport or
return any alien . . . to a country if
the Attorney General determines that such
alien's life or freedom would be
threatened in such country on account of
race, religion, nationality, membership
in a particular social group, or
political opinion.

An alien who meets this standard of eligibility, and who does

not fall under a statutory exception, is entitled to 

withholding of deportation; the Attorney General does not

have discretion in Section 243(h) proceedings. Cardoza- 

Fonseca, 480 U.S. at 429. However, Section 243(h)(2) does 

enumerate several classes of aliens to whom Section 243(h)(1)

does not apply. 8 U.S.C. 1253(h)(2). One such exception

is where "the alien, having been convicted by a final

judgment of a particularly serious crime, constitutes a

danger to the community of the United States." 8 U.S.C. 

1253(h)(2)(B)("the Particularly Serious Crime Exception").

The BIA has interpreted this exception to require

only a determination of whether an alien's crime is

"particularly serious"; according to the BIA, an alien

convicted of a particularly serious crime necessarily

-27- 27

constitutes a danger to the community. See, e.g., Matter of 

K-, 20 I. & N. Dec. 418, 1991 WL 353530, *3 (BIA Nov. 5, 

1991); Matter of Carballe, 19 I. & N. Dec. 357, 360 (BIA 

1986)("The phrase 'danger to the community' is an aid to

defining 'particularly serious crime,' not a mandate that

administrative agencies or the courts determine whether an

alien will become a recidivist."). This court, while

acknowledging that there is "considerable logical force" to

the argument that the Particularly Serious Crime Exception

requires a separate determination of dangerousness to the

community, has upheld the agency's interpretation under

Chevron U.S.A., Inc. v. Natural Resources Defense Council, 

Inc., 467 U.S. 837 (1984). See Mosquera-Perez v. INS, 3 F.3d 

553 (1st Cir. 1993).

The Immigration Judge here made a specific finding

that Choeum's crime was a particularly serious one, and then,

applying the BIA interpretation of the Exception, determined

that Choeum was ineligible for withholding of deportation.

The BIA similarly rejected Choeum's argument that she was

entitled to a separate determination of whether she poses a

danger to the community. Were it not for AEDPA, that, under

Mosquera-Perez, would be the end of it. 

However, in Section 413(f) of AEDPA, Congress

amended Section 243(h) of the INA to include a new subsection

(h)(3). The new provision states, in relevant part:

-28- 28

Notwithstanding any other provision of
law, paragraph (1) [the withholding
provision] shall apply to any alien if
the Attorney General determines, in the
discretion of the Attorney General, that
. . .
(B) the application of paragraph (1) to
such alien is necessary to ensure
compliance with the 1967 United Nations
Protocol Relating to the Status of
Refugees.

8 U.S.C. 1253(h)(3).

Choeum argues that, by directing that the

withholding provisions be applied so as to "ensure

compliance" with the 1967 United Nations Protocol Relating to

the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577

(the "Protocol"), "not withstanding any other provision of

law," Congress incorporated the Protocol into United States

statutory law. The Protocol, Choeum argues, requires a

separate, individualized determination that the alien is

currently a danger to the community. Thus, according to 

Choeum, Section 413(f) of AEDPA expressed a congressional

intent to reject the BIA's rulings that Section 243(h)(2)

requires only a determination that the alien has been

convicted of a particularly serious crime.11

 

11. The INS initially argued that Section 413(f) of AEDPA
did not apply to Choeum's case, as AEDPA Section 413(g)
instructed that the amendments made by Section 413(f) should
apply only to those applications on which final action had
not been taken before the date of AEDPA's enactment, i.e. 
April 30, 1996. See AEDPA 413(g), 110 Stat. 1269-70. The 
BIA denied Choeum's application for withholding on February
9, 1996; the INS argued that this - not judicial review -
constituted "final action" on Choeum's application, and that

-29- 29

The Protocol binds its signatories to compliance

with the substantive provisions of the 1951 United Nations

Convention Relating to the Status of Refugees, 189 U.N.T.S.

150, 176 (1954), 19 U.S.T. 6259, 6278, T.I.A.S. No. 6577

(1968) (the "Convention"). Article 33.1 of the Convention

prohibits the "refoulement" -- the forced return or

expulsion -- of a refugee to territories where his life or

freedom would be threatened on account of his race, religion,

nationality, membership in a particular social group, or

political opinion. Art. 33.1, 19 U.S.T. at 6276. Article

33.2 of the Convention provides an exception to this

principle of "nonrefoulement":

The benefit of the present provision may
not, however, be claimed by a refugee for
whom there are reasonable grounds for
regarding as a danger to the security of
the country in which he is, or who, 
having been convicted by a final judgment 
of a particularly serious crime, 
constitutes a danger to the community of 
that country. 

Art. 33.2, 19 U.S.T. at 6276(emphasis added).

The United States statutory law on withholding,

including the Particularly Serious Crime Exception, thus

closely mirrors the language of the Convention. (This is not

surprising, as Congress, when it enacted the relevant

provisions of Section 243(h) in 1980, specifically intended

 

Section 413(f) was therefore inapplicable to Choeum's case.
We need not decide whether the INS's interpretation of
"final action" is the correct one. 

-30- 30

to bring United States refugee law into conformance with the

Protocol. See Cardoza-Fonseca, 480 U.S. at 436-37; Mosquera- 

Perez, 3 F.3d at 556.) As the express terms of the 

Convention do not differ from those of the United States'

Particularly Serious Crime Exception, the explicit reference

to the Protocol in AEDPA's Section 413(f) would not appear to

modify that Exception.

Choeum argues, however, that Section 413(f)

expresses a congressional intent to incorporate the United

Nations' interpretation of the Protocol's withholding

provisions into United States immigration law. She refers

this court to an advisory opinion on AEDPA issued by

Representative Anne Willem Bijleveld of the United Nations

High Commissioner for Refugees ("UNHCR") to the American

Immigration Lawyers Association, and to the UNHCR Handbook on 

Procedures and Criteria for Determining Refugee Status 

(1979)("UNHCR Handbook"). 

Mr. Bijleveld's opinion takes the position that the

Protocol requires a signatory state to make a separate

determination that the refugee it seeks to expel is a danger

to the community. The UNHCR Handbook, for its part, does not

unambiguously support Choeum's position. The UNHCR Handbook,

while requiring an individualized determination of the

applicability of Article 33.2's exclusion clause, focusses on

the definition of "serious non-political crime" and does not

-31- 31

explicitly require a separate dangerousness determination.

See UNHCR Handbook, supra, 154-57, at 36-37. 

The INS, in contrast, points this court to Matter 

of Q-T-M-T-, Interim Dec. 3300, 1996 WL 784581, *16 (BIA Dec. 

21, 1996). In Matter of Q-T-M-T-, the BIA held that Section 

413(f) of AEDPA did not require a separate dangerousness

determination:

[W]e have consistently held that neither
the Convention and Protocol nor section
243(h)(2)(B) of the Act requires a
separate "dangerousness" determination
"focusing on the likelihood of future
misconduct on the part of the alien." . .
. [E]very reviewing court reaching this
issue has sustained our prior holding in
this regard. Indeed, in 1995, the
Attorney General issued a regulation
adopting this construction of section
243(h)(2)(B). 8 C.F.R. 
208.16(c)(2)(ii)(1995). Moreover, there
is nothing in the legislative history of
either the AEDPA or the IIRIRA suggesting
that Congress had any intent to override
this well-settled construction of the
law. And, particularly in enacting the
IIRIRA, Congress reflected its ability to
clearly address and override Board and
judicial constructions of the law which
it deemed erroneous. Thus, we do not
find our ruling on this issue [to be]
affected by section 243(h)(3) of the Act.

Id.  

The INS further argues that the reason for enacting

Section 413(f) was that AEDPA expanded the definition of

"aggravated felony" to include crimes that might be

considered less serious than those the Protocol intended to

cover in its exclusion clause. Section 243(h)(2) of the INA,

-32- 32

8 U.S.C. 1253(h)(2), expressly states that, for withholding

purposes, "an alien convicted of an aggravated felony shall

be considered to have committed a particularly serious

crime." The INS contends that AEDPA Section 413(f) was thus

intended to preserve the Attorney General's flexibility in

assessing whether crimes now defined as aggravated felonies

were, in fact, "particularly serious" within the meaning of

the Protocol.

In interpreting Section 413(f) of AEDPA, we must

first determine if the statutory language makes the intent of

Congress clear and unambiguous; if the statute is ambiguous,

we give deference to the BIA's interpretation of the

immigration laws, unless that interpretation is arbitrary,

capricious, or contrary to the statute. Chevron, 467 U.S. at 

842-45 (1984); Mosquera-Perez, 3 F.3d at 554. 

The plain language of Section 413(f) is not very

illuminating. It directs the Attorney General to ensure

compliance with the Protocol, yet as noted, the language of

the Protocol's withholding provisions has already been

codified as United States statutory law. Section 413(f) thus

appears, at first glance, to be surplusage. The legislative

history of AEDPA is similarly unhelpful.

The import of Section 413(f) is thus ambiguous, and

we turn to the agency interpretation. The reasoning behind

the BIA's interpretation is fairly persuasive. Congress is

-33- 33

presumed to be aware of the BIA's longstanding construction

of the Particularly Serious Crime Exception. See Mosquera- 

Perez, 3 F.3d at 559. If Section 413(f) of AEDPA were meant 

to correct that construction, Congress certainly would have

done so in a less oblique fashion. We also note that Section

413 of AEDPA, as a whole, is entitled "Denial of Other Relief

to Alien Terrorists," and that the legislation shows few, if

any, indications of having intended to expand the rights of 

criminal aliens. In this context, the INS's explanation of

why Section 413(f) was enacted is certainly a reasonable one.

In turn, Choeum's arguments are unpersuasive. As

noted, the UNHCR Handbook does not unambiguously support her

interpretation of the Protocol. Moreover, the Supreme Court,

while acknowledging that the UNHCR Handbook is "useful in

giving content to the obligations that the Protocol

establishes," expressly disclaimed the suggestion that the

Handbook had "the force of law or in any way binds the INS."

Cardoza-Fonseca, 480 U.S. at 439 n.22.  

In this context, where the statute is ambiguous,

and the BIA has offered a reasonable interpretation of its

provisions, it would be improper for this court to substitute

the advisory opinion of an international body for the

reasoned judgment of the domestic administrative agency with

primary responsibility for administering the statute.

Accordingly, we find that the interpretation of Section

-34- 34

243(h)(2)(B) and Section 243(h)(3) adopted by the BIA is not

unreasonable, arbitrary, or capricious. Consequently, a

separate inquiry into Choeum's dangerousness to the community

was not required. See Mosquera-Perez, 3 F.3d at 559. Choeum 

was not eligible for withholding of deportation.

B. Asylum 

Choeum next argues that the regulation under which

she was deemed ineligible for asylum exceeds the authority

delegated to the Attorney General by Congress. 

An INS regulation provides that: "An application

for asylum shall be denied if . . . [t]he alien, having been

convicted by a final judgment of a particularly serious crime

in the United States, constitutes a danger to the community .

. . ." 8 C.F.R. 208.14(d)(1).12 This regulation was

promulgated pursuant to then-current Section 208(a) of the

INA, 8 U.S.C. 1158(a),13 which provided:

The Attorney General shall establish a
procedure for an alien . . . to apply for
asylum, and the alien may be granted
asylum in the discretion of the Attorney

 

12. 8 C.F.R. 208.14(d) previously appeared at 8 C.F.R. 
208.14(c), and is referred to by its former designation in
the administrative proceedings in this case, and in the cases
discussed herein.

13. Section 604 of IIRIRA, "Asylum Reform," substantially
amends Section 208 of the INA, 8 U.S.C. 1158. However,
Section 604 of IIRIRA applies only to applications for asylum
filed on or after April 1, 1997. See IIRIRA 604(c), 110 
Stat. 3009-694. References in this opinion are to the
earlier version of 8 U.S.C. 1158, which may be found at 8
U.S.C.A. 1158 (West 1996).

-35- 35

General if the Attorney General
determines that such alien is a refugee
within the meaning of . . . this title.

Choeum points out that, in 1990, the same year that

the challenged regulation was adopted, Congress enacted what

was then 8 U.S.C. 1158(d), which provided that "[a]n alien

who has been convicted of an aggravated felony . . . may not

apply for or be granted asylum." 8 U.S.C. 1158(d). Choeum

argues that, by negative implication, Congress did not intend

a similar per se bar for aliens convicted of particularly 

serious crimes, and that the Attorney General exceeded the

authority delegated by Congress in barring a larger class of

aliens than that barred by statute.

The statute expressly conferred broad authority on

the Attorney General to "establish a procedure" for asylum

applications, and the granting of asylum is explicitly left

to the Attorney General's discretion. Under Chevron, where 

Congress "explicitly left a gap for the agency to fill," and

where there is thus "an express delegation of authority to

the agency to elucidate a specific provision of the statute

by regulation," we should uphold a gap-filling regulation

unless it is "arbitrary, capricious, or manifestly contrary

to the statute." Chevron, 467 U.S. at 843-44. 

The Attorney General's determination that aliens

convicted of particularly serious crimes should be ineligible

for asylum is not unreasonable. Applying Chevron, we do not 

-36- 36

find that the regulation exceeds the broad grant of authority

conferred by the enabling statute. Accordingly, Choeum's

application for asylum was properly denied. We note that the

two other circuits to have considered the argument made here

by Choeum have also upheld the regulation. See Ahmetovic v. 

INS, 62 F.3d 48, 51 (2d Cir. 1995)(finding that Congress did 

not intend to limit agency's power to impose a higher

standard on asylum seekers); Komarenko v. INS, 35 F.3d 432, 

436 (9th Cir. 1994)(noting similarity of asylum regulation to

statutory withholding provisions for aliens who have

committed particularly serious crimes).14 

C. 212(c) Waiver 

Choeum also argues that the BIA abused its

discretion in denying her application for a waiver of

deportation under Section 212(c) of the INA, 8 U.S.C. 

1182(c).

The BIA denied Choeum's application for Section

212(c) relief twice, first when affirming the Immigration

Judge's decision and again when denying Choeum's motion to

reopen. We consider only the first of these denials. See 8 

U.S.C. 1105a(a)(6)("[W]henever a petitioner seeks review of

 

14. We also note that, in the asylum provisions of IIRIRA,
Congress has made aliens who have been convicted of
particularly serious crimes ineligible for asylum, and
explicitly stated that the Attorney General may provide, by 
regulation, additional limitations and conditions on the
consideration of an application for asylum. See 8 U.S.C.  
1158(b)(2)(A)(ii); 1158(d)(5)(B) (1997 version).

-37- 37

an order under this section, any review sought with respect

to a motion to reopen or reconsider such an order shall be

consolidated with the review of the order.").15 

We only have jurisdiction to review the BIA's

initial denial of Section 212(c) relief. Relief under

Section 212(c) is discretionary, and review by this court is

for abuse of discretion. See, e.g., Hazzard v. INS, 951 F.2d 

435, 438 (1st Cir. 1991). We will uphold such a denial

unless it was made "without a rational explanation,

inexplicably departed from established policies, or rested on

an impermissible basis." Id.  

Here, the BIA found that the Immigration Judge

"gave proper consideration to the discretionary factors." We

agree, and can find no abuse of discretion. Choeum's crime

was, as the Immigration Judge found, profoundly disturbing.

Choeum argues that the Immigration Judge improperly

determined that she showed little remorse. However, the

Immigration Judge observed her demeanor and heard her

testimony. This finding essentially turns on Choeum's

credibility and does not provide a basis to overrule the BIA.

Choeum also argues that the Immigration Judge improperly

emphasized her reliance on welfare, by failing to consider

 

15. As noted, IIRIRA repealed 8 U.S.C. 1105a. See supra 
note 2. IIRIRA does adopt a consolidation provision that is
substantially similar to the old provision. See IIRIRA  
306(a)(2) (current 8 U.S.C. 1252(b)(6)). 

-38- 38

the circumstances that have made it difficult for her to

work. Many of these circumstances are of Choeum's own

making. Moreover, many, if not most immigrants, face

language and educational barriers that make finding

employment challenging. 

Choeum's only argument of substance is that, by

affirming the decision of the Immigration Judge "based upon

and for the reasons set forth in that decision," the BIA

apparently did not consider the new evidence of the post-

hearing birth of her son David. The INS replies that the BIA

is an appellate body and that Choeum failed to comply with

the proper procedure for presenting new evidence, which is to

move to reopen proceedings before the Immigration Judge, see 

8 C.F.R. 3.2.

While the BIA may, in its discretion, consider new

evidence presented for the first time on appeal, it is

certainly appropriate for the BIA to insist on compliance

with the proper procedures. Fair proceedings are best

assured through proper entry into the record of all relevant

evidence, and through the ability of the factfinder to sift

that evidence. The BIA has given notice, in earlier

decisions, that it may refuse to consider new evidence that

is not part of the record before the Immigration Judge. See, 

e.g., Matter of C-, 20 I. & N. Dec. 529, 1992 WL 200361, *6 

(BIA May 28, 1992). In these circumstances, the BIA's

-39- 39

insistence that the procedural formalities be observed cannot

be considered an abuse of discretion.16

Accordingly, the decisions of the BIA challenged in

the first petition are affirmed. The second petition is 

dismissed.

 

16. We also note that the birth of a second child was
unlikely to substantially shift the equities of petitioner's
case. While it is true that Choeum has a second child, he is
very young, allegedly has no relationship with his father,
and presumably does not yet have significant ties to the
United States. Additionally, the BIA, by relying on the
record before the Immigration Judge, did not consider the
other post-hearing events in Choeum's life, including
quitting her job, returning to reliance on welfare, and
failing to pursue further her GED or other educational
avenues. 

-40- 40